# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| LOUIS DANA GRADISHER, | ) | CASE NO. 5:12CV2362 |
| | ) | |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | **MEMORANDUM OPINION** |
| CITY OF AKRON, et al., | ) | |
| | ) | |
| | ) | |
| DEFENDANTS. | ) | |

Before the Court are fully-briefed cross-motions for summary judgment. (Defendants' motion, Doc. No. 48;[1] Plaintiff's motion, Doc. No. 49.[2]) For the reasons discussed below, defendants' motion is granted and plaintiff's motion is denied.

## I. PROCEDURAL BACKGROUND

On August 21, 2012, plaintiff Louis Dana Gradisher ("Gradisher" or "plaintiff") filed a complaint in the Summit County Court of Common Pleas against the City of Akron and several Akron police officers. (Doc. No. 1-1.) Defendants timely removed the action to this Court on the basis of Fourth and Fourteenth Amendment claims asserted under 42 U.S.C. § 1983. (Doc. No. 1.) Plaintiff subsequently amended the complaint twice. (Doc. Nos. 14 & 26.)

The second amended complaint ("Compl." [Doc. No. 26]) lists the following defendants: City of Akron, Officer Matthew Hackathorn, Officer Jeffrey P. Smith, Officer Neil

---

[1] Plaintiff filed his opposition (Doc. No. 52) and defendants filed their reply (Doc. No. 56). Plaintiff also filed a motion for leave to file a sur-reply. (Doc. No. 57.) Defendants then filed a motion for leave to file a response, should plaintiff be granted leave to sur-reply. (Doc. No. 58.) The Court perceives no reason to permit the filing of any additional briefs. Therefore, both Doc. No. 57 and Doc. No. 58 are denied.

[2] Defendants filed their opposition (Doc. No. 53) and plaintiff filed his reply (Doc. No. 55).

Prather, Officer James C. Craft, Officer James Leadbetter, Officer Vince Yurick, and Chief James Nice. The second amended complaint also sets forth the following claims for relief:

1. 42 U.S.C. § 1983 against Hackathorn, Smith, Craft, Prather and Leadbetter for excessive force in violation of the Fourth Amendment

2. 42 U.S.C. § 1983 against Hackathorn, Smith, Craft, Leadbetter and Yurick for unlawful/unreasonable entry/search in violation of the Fourth Amendment

3. 42 U.S.C. § 1983 against Hackathorn, Smith, Craft, Leadbetter and Prather for false/wrongful arrest/imprisonment in violation of the Fourth Amendment and Fourteenth Amendment

4. 42 U.S.C. § 1983 against Hackathorn, Smith, Craft, Leadbetter, Yurick and Nice for malicious prosecution in violation of the Fourth Amendment and Fourteenth Amendment

5. 42 U.S.C. § 1983 against the City of Akron and Nice for customs and policies causing constitutional violations

6. Common law false arrest/imprisonment against Hackathorn, Smith, Prather, Craft, Leadbetter and the City of Akron

7. Common law malicious prosecution against Hackathorn, Smith, Craft, Leadbetter, Yurick, Nice and the City of Akron

8. Common law assault and battery against Hackathorn, Smith, Craft, Leadbetter, Prather and the City of Akron

9. Gross neglect against Hackathorn, Smith, Craft, Leadbetter and Prather

10. Negligent hiring and retention against the City of Akron

11. Infliction of emotional distress against Hackathorn, Smith, Craft, Leadbetter, Yurick and Prather

On August 7, 2013, defendant Prather was voluntarily dismissed from the case. (Doc. No. 39.) On December 2, 2013, the third and sixth claims for relief were voluntarily dismissed; in addition, all but defendant Hackathorn were dismissed from the fourth and seventh claims. (Doc. No. 50.)

2

## II. FACTUAL BACKGROUND

All the claims in the second amended complaint arise from events that took place on September 2, 2011. During the late afternoon on that day, Gradisher (a white male) met a friend for drinks at Georgie's Pub & Zoo ("Georgie's") in Akron, Ohio, where he consumed three or four beers and one shot of whiskey. (Gradisher Dep. [Doc. No. 48-1] at 363-64.) While sitting at the bar, Gradisher observed the outline of a gun in the pocket of a black man sitting next to him. He exchanged words with the man, and decided to leave the bar and go to his home at 402 Kline Avenue in Akron, about a quarter mile from the bar. (*Id.* at 365.) Once there, he drank another "three or four or five" beers. (*Id.*)

Gradisher decided he should call Akron's 911 system to report the man with the gun at Georgie's. He claims he made the call from his cell phone after he got home and drank the additional beers; but he was unable to say what time he made the call. (*Id.* at 365-66.) This was the first of four calls to 911 that Gradisher made that day, within a very short period of time.[3] When, during his initial call, the 911 operator asked Gradisher for his name, he became angry and hung up; but the operator immediately called him back. (*Id.* at 366-67.) This second call turned out to be a "total embarrasment" to Gradisher. Due to his insults and obscene language, the operator hung up on him, prompting him to call 911 two more times, each time using multiple obscenities and vulgarities. At his deposition, Gradisher admitted it was his voice on the recordings of each of the four calls and that his conduct was "inexcusable." (*Id.* at 367-68.) He claimed to have "had a buzz on," and was "short temper[ed] and frustrated" because he had broken up with his girlfriend that day. (*Id.*)

---

[3] Recordings of all four calls were manually filed by defendants. (*See* Doc. No. 47.)

Following Gradisher's first phone call to 911, defendants Hackathorn and Craft were dispatched to Georgie's. (Hackathorn Dep. [Doc. No. 48-2] at 416.) There, they spoke to the bartender, who told them there was an argument at the bar between a black male and a white male. The bartender also told them "that the white individual had made a comment that he had a gun out in his van" and "wanted [the black male] to come out to the van." (*Id.* at 417; Craft Dep. [Doc. No. 48-3] at 496.) She described the van as "a white work van." (Hackathorn Dep. at 418.) She described the white male as in his 40s, stocky, and wearing a work shirt. (*Id.*) The officers felt that they did not have enough information, much less any victim, to warrant making a report regarding the incident at Georgie's. (*Id.*)

In the meantime, dispatchers identified a connection between the first 911 call regarding a man with a gun at Georgie's and these additional "unnecessary and vulgar calls to 911." (Smith Dep. [Doc. No. 48-4] at 534.) It was determined that the caller was Gradisher, who resided at 402 Kline Avenue. (*Id.*) Smith testified that he and several other officers were dispatched to Kline Avenue. He stated that they were "responding to 402 Kline based on multiple 911 calls about a man with a gun[,]" and that he did not "know who ha[d] the gun." (*Id.*)

In addition to Smith and Leadbetter, Hackathorn and Craft (who had previously been dispatched to Georgie's and had heard the bartender's description of a white male claiming to have a gun in his van) also responded to the dispatch to Kline Avenue. While en route, the officers checked for any outstanding warrants, and discovered a "failure to appear warrant for a charge out of [the Akron Police Department] coming back to that address." (Hackathorn Dep. at 422.) The officers also discovered a white van in the driveway at 402 Kline Avenue and, when they ran the license plate, it pointed back to Gradisher, whose physical decription on his driver's license matched the bartender's generic description of the white male. (*Id.*) Hackathorn testified

4

that they were uncertain as to who had the gun, since the 911 caller said it was a black male, but the bartender said it was a white male. (*Id.*; *see also* Smith Dep. at 534 ("What I know is I'm responding to 402 Kline based on multiple 911 calls about a man with a gun. I don't know who has the gun.").)

The officers generally agree that they were dispatched to Kline Avenue for two reasons. First, they were dispatched to check on the apparent misuse of the 911 system. Second, however, given the confused state of the facts as they knew them, they also needed "to see if there was a problem or someone needed help[.]" (Hackathorn Dep. at 422.) Hackathorn testified that "[w]hen someone calls [911] numerous times and they don't give a reason other than they want to be confrontational on the phone and they're making an erratic -- . . . . Could there be something going on where he might need help and he may not realize it? He may be going through an episode, could be a reaction to something." (*Id.* at 425.) Smith testified: "[W]ith [the 911 caller's] erratic and irrational behavior, and the possibility of a gun, we had a duty to check his welfare." (Smith Dep. at 537.)[4]

At 402 Kline Avenue, Hackathorn knocked on the front door several times and announced "Akron Police." (Hackathorn Dep. at 423-24.) He heard someone come to the front door and turn the dead bolt lock. (*Id.*) Leadbetter, who was in the back yard, saw a man come out the back door of the house. Leadbetter announced, "Hey, police." But the man went back in the house, without responding. Leadbetter called after him that they just wanted to talk to him.

---

[4] Gradisher disputes that there was ever any purpose to check on his welfare because that is not expressly stated in any officer's report of the incident. However, Hackathorn's report does state that Yurick told them to "force entry to check the welfare." (Hackathorn Use of Force Report [Doc. No. 49-12] at 804.) Leadbetter's report states that he told the man who came out the back door at Kline Avenue that they wanted to "check on him." (Leadbetter Use of Force Report [Doc. No. 49-13] at 805.) It also states that Hackathorn informed Leadbetter that the officers were going to "force the door open to check for anyone injured." (*Id.*)

(Leadbetter Dep. [Doc. No. 48-5] at 577, 578.) Leadbetter reported these facts to the other officers; at the time, Leadbetter was unaware that the man he saw was Gradisher. (*Id.*)

Hackathorn called his supervisor, defendant Yurick, who knew what was going on and had been listening to the radio traffic as he was "trying to wrap things up for [his] shift duties." (Yurick Dep. [Doc. No. 48-6] at 611.)[5] Yurick testified as to his "understanding . . . that there was a guy with a gun at Georgie's, and somehow this fellow left and was calling now from a different address of 402 Kline, and there were numerous calls of 911 being received from there. . . . And then the officers . . . find out that . . . a person who lives at that address had a warrant, there's a person from that address calling 911, it's associated with the gun at Georgie's, a person comes out the back door and goes back in." (*Id.* at 614.) Under "all those circumstances," Yurick perceived the situation to be "very serious and dangerous[.]" (*Id.*) He concluded: "Holy smokes, I mean, we have a duty to make sure someone's not being held at gunpoint or had been murdered there." (*Id.*) Yurick authorized entry to the Kline Avenue residence to "check the welfare in there." (Hackathorn Dep. Ex. K, Tracks 4-8.) Hackathorn and Smith kicked open the door and the four officers entered the house. (*Id.* at 428.)

Gradisher claims he was in the shower in his basement when he heard his cocker spaniel "going crazy jumping on the door." (Gradisher Dep. at 369.) He figured someone was at the door, but "just continued on with [his] shower." (*Id.*) Then he "heard a thunderous bang, bang, bang on [his] front door, . . . [and thought] oh, no, man, somebody's breaking into [his] house." (*Id.*)[6] He stated that the possibility it was the police was "the furthest thing from [his]

---

[5] Yurick's shift was from 11:00 a.m. to 7:30 p.m. (Yurick Dep. at 611.)

[6] A year earlier, Gradisher had been "beaten pretty bad" by a motorcycle gang following a dispute about a beer box being thrown in his yard. (Gradisher Dep. at 352-53.) He claims that, when he heard the "thunderous bang," he thought: "[I]t's that biker gang here to get me or something." (*Id.* at 369.)

mind" because  he "felt that [he] had none nothing wrong other than give the 911 dispatcher a hard time." (*Id.*)

Gradisher quickly dressed and, hearing someone upstairs, he hid in the basement corner, behind some shelves, and covered himself with a sheet. (*Id.*) He heard someone say, "I think he's here[,]" and then saw the light from a flashlight through the sheet. (*Id.* at 370.) He claims he then "had a pretty good idea that they were the police[.]" (*Id.* at 371.) He describes what happened next as follows:

> And then he finds me with the sheet, under the sheet, I'm sitting here like this, and then when he -- I saw the flashing lights over the sheet, the sheet illuminate up, and that's when I thought, okay, these are the police. So within a split second of that he grabbed the sheet and pulled it off of me and I went just like this (indicating), I put my hands up and my legs out, I said, You got me, You got me. And at that time he fired the shot into my breast and started delivering the electricity. At that same time he started delivering the electricity, they both were screaming, Get the fuck down, Get the fuck down. And I remember grunting because it contorted me like this (indicating). When he shot me it contorted me up tight. And then I said, I can't move, I'm being electrocuted, I can't move.
>
> And they just kept giving me – the current was nonstop, just kept giving it to me. And then I was in the sitting position, I was like -- (witness groaning) and slumped over to my right, and then the only thing I remember after that is them taking me up out of the basement.

(*Id.*)[7]

Craft was the officer who deployed his taser, while Hackathorn and Smith attempted to subdue Gradisher, and Leadbetter covered the officers with his weapon drawn. When Craft encountered Gradisher, he noted that he was "in a crouched or attempting-to-be-crouched position." (Craft Dep. at 476.) Craft described Gradisher as "in an active position[,]" and "not stationary with both knees on the ground." (*Id.*; *see also* Hackathorn Dep. at 441 ("I

---

[7] Gradisher's description suggests that Hackathorn, who was the first officer to enter the basement, and who pulled the sheet off Gradisher, was also the officer who tased him. However, that is not correct, as the subsequent factual recitation shows.

gave him verbal commands that he did not comply with. When he tried to stand up, . . . [he had a] clenched fist like he might take a fighting stance against us or try to fight."); Leadbetter Dep. at 586 (Gradisher was "in like a catcher's stance").) Hackathorn and Smith were attempting to handcuff Gradisher. (Hackathorn Dep. at 441, 447;[8] Smith Dep. at 551.) The officers were giving Gradisher verbal commands to get on the ground, get his hands up, stop resisting, and give himself up. (Hackathorn Dep. at 441-42; Craft Dep. at 480.) Gradisher claims he heard the commands, but was unable to comply due to the effects of the taser. (Gradisher Dep. at 376.)

Craft decided to deploy his taser both because Gradisher was not obeying the officers' commands and, more importantly, because he felt they were possibly in danger, due to his belief that Gradisher might have had, and been reaching for, a gun. He explained:

> . . . I deployed because there was a possibility of a gun. If I let him do what he wants and reach for wherever he wants, he may pull out a gun and shoot me or one of the other three officers. It is very possible because it is a gun call.
>
> * * *
>
> . . . [W]e were called out reference a male with a gun in a bar. We spoke to several people in the bar who said Dana, not speaking of him by name, but described him and his vehicle, said he had a -- he was in here yelling and ranting and raving about a gun and said he had a gun in his van that he was gonna go get and then we received calls from him from his house, that van was there. So my train of thought here is safety for me and my officers that are with me. I'm not assuming he has a gun but I don't know if he does or not. I don't know him, I never met him.
>
> * * *
>
> . . . And he was actively coming up and trying to push out of a pile of rubbish and whether -- you know, naturally that's going to include you losing your balance and going to the ground where I can't see your hands. Now, I don't know if he's gonna pull up with a gun or if he's going to pull it out of his waist or he's gonna pull it out of the clothes that he was hiding in. . . .

---

[8] Hackathorn testified that, because he saw no "visible threat of a  weapon[,]" he "holstered [his] gun" and commanded Gradisher to "[g]et on the ground, get your hands up." Gradisher did not comply. (Hackathorn Dep. at 441.) Hackathorn then observed Gradisher's left hand "going back into his pants like he was going to grab something." (*Id.*) As Hackathorn tried to grab Gradisher's hand, he "heard a taser deployment from Officer Craft strike him." But Hackathorn observed no change in Gradisher's demeanor. (*Id.*)

(Craft Dep. at 487, 489, 490.)

Craft shot Gradisher in the chest with the taser probes. Initially, Gradisher did not react, so Craft held the trigger into a second, partial cycle, at which time Gradisher "winced." (Craft Dep. at 481-82.) Craft thought he was "not making a good connection[,]" so he gave "one more trigger pull." (*Id.* at 482.) Gradisher continued to resist, so Craft then "decided to move in on him." (*Id.*) Craft drive-stunned Gradisher in his arm or side, which was ineffective. He then administered one final drive stun for a full cycle. (*Id.*) At that point, Hackathorn was able to fully handcuff Gradisher. (Hackathorn Dep. at 448.) It is undisputed that there was no post-restraint use of the taser.

The Akron Fire Department EMS responded to the scene and removed the taser barbs from Gradisher. (EMS Report [Doc. No. 48-7].)[9] EMS reported that Gradisher had no additional complaints, no respiratory distress, and no major signs of trauma. (*Id.*)

Gradisher was transported to the Summit County Jail, where he was processed and admitted. (Gradisher Dep. Ex. E.)[10] Officer Hackathorn signed criminal complaints in Akron Municipal Court for violations of Ohio Rev. Code § 4931.49(E) (improper use of 911 system) and Ohio Rev. Code § 2921.23 (resisting arrest). (Defendant's Motion, Ex. H [Doc. No. 48-8].) Gradisher entered a plea of no contest and was found guilty of improper use of the 911 system; the resisting arrest charge was dismissed. (*Id.* Ex. I [Doc. No. 48-9].)

---

[9] Gradisher insists that one of the officers pulled the barbs out of his chest; but he has no recollection that the EMS ever treated him at the scene. (Gradisher Dep. at 373.)

[10] This exhibit is the video footage of Gradisher's arrival and booking at the jail; it has been manually submitted for the record.

# III. APPLICABLE LAW

## A.      Summary Judgment Standard

Under Fed. R. Civ. P. 56(a), when a motion for summary judgment is properly made and supported, it shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

An opposing party may not rely merely on allegations or denials in its own pleading; rather, by affidavits or by materials in the record, the opposing party must set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c)(1). Affidavits or declarations filed in support of or in opposition to a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). A movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *White v. Turfway Park Racing Ass'n.*, 909 F.2d 941, 943-44 (6th Cir. 1990), *impliedly overruled on other grounds by Salve Regina Coll. v. Russell*, 499 U.S. 225, 111 S. Ct. 1217, 113 L. Ed. 2d 190 (1991). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the

applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict[.]" *Id*. at 252.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. Moreover, "[t]he trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established that create a genuine issue of material fact. *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id*.

## B.    Qualified Immunity

Gradisher has asserted several claims under 42 U.S.C. § 1983. To prevail on those claims, he "must establish that a person acting under color of state law deprived [him] of a right secured by the Constitution or laws of the United States." *Waters v. City of Morristown*, 242 F.3d 353, 358-59 (6th Cir. 2001) (citation omitted). But the Supreme Court has held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). "The central purpose of affording public officials

qualified immunity from suit is to protect them 'from undue interference with their duties and from potentially disabling threats of liability.'" *Elder v. Holloway*, 510 U.S. 510, 514, 114 S. Ct. 1019, 127 L. Ed. 2d 344 (1994) (quoting *Harlow*, 457 U.S. at 806).

### IV. ANALYSIS[11]

**A.      First and Second Claims for Relief: 42 U.S.C. § 1983 Excessive Force and Unreasonable Entry (Fourth Amendment)**

Plaintiff alleges, in his first claim for relief, that Hackathorn, Craft, Smith and Leadbetter, "acting under color of law and within the course and scope of their employment as police officers with Defendant City of Akron, used unnecessary, unreasonable, outrageous and excessive force" on him (Compl. ¶ 53), and that "[f]aced with the circumstances present . . . reasonably prudent law enforcement officers . . . would or should have known that the uses of force . . . violated Plaintiff's clearly established Fourth Amendment rights to be free from unreasonable and excessive uses of force and seizures." (*Id.* ¶ 55.)

In his second claim for relief, plaintiff alleges that the four officers, plus Yurick, "acting under color of law and within the course and scope of their employment as police officers with Defendant City of Akron, entered [his] residential property[12] without a warrant, without permission and without probable cause or reasonable suspicion in violation of [his] clearly established rights guaranteed by the Fourth Amendment." (*Id.* ¶ 58.) He asserts that "[f]aced with the circumstances present . . . , reasonably prudent law enforcement officers . . . would or should have known that the entries described . . . violated [his] clearly established

---

[11] Gradisher's motion seeks only partial summary judgment. He conflates the first and second claim for relief into a claim of "forced entry" in violation of the Fourth Amendment and seeks summary judgment on that claim and on the fifth claim for relief (municipal liability). The Court is of the view that it is better to address the claims as they are asserted in the second amended complaint.

[12] It is indisputable that Yurick himself never entered Gradisher's property. At most, he could only be said to have authorized the other officers' entry.

Fourth Amendment rights to be free from unreasonable and unlawful entries, searches, and seizures." (*Id.* ¶ 60.)

The Court will address plaintiff's second claim first.

It is a "'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Groh v. Ramirez*, 540 U.S. 551, 559, 124 S. Ct. 1284, 157 L. Ed. 2d 1068 (2004) (quoting *Payton v. New York*, 445 U.S. 573, 586, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980)). The warrant requirement is, however, subject to exceptions.

In *Brigham City v. Stuart*, 547 U.S. 398, 126 S. Ct. 1943, 164 L. Ed. 2d 650 (2006), the Supreme Court held that "police may enter a home without a warrant when they have an objectively reasonable basis" for believing entry is necessary due to "the exigencies of the situation[.]" *Id.* at 400, 403 (internal citations and quotes omitted). "Exigent circumstances arise when an emergency situation demands immediate police action that excuses the need for a warrant." *Johnson v. City of Memphis*, 617 F.3d 864, 868 (6th Cir. 2010) (citations omitted). "[L]aw enforcement officers 'may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury.'" *Michigan v. Fisher*, 558 U.S. 45, 47, 130 S. Ct. 546, 175 L. Ed. 2d 410 (2009) (per curiam) (quoting *Brigham City*, 547 U.S. at 403.) "This 'emergency aid exception' does not depend on the officers' subjective intent or the seriousness of any crime they are investigating when the emergency arises." *Id.* (citing *Brigham City*, 547 U.S. at 404-05). "It requires only 'an objectively reasonable basis for believing,' that 'a person within [the house] is in need of immediate aid[.]'" *Id.* (quoting *Brigham City*, 547 U.S. at 406; *Mincey v. Arizona*, 437 U.S. 385, 392, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978)).

13

Plaintiff asserts that there were no exigent circumstances that permitted warrantless entry to his home. He states:

> At no time did dispatch indicate Dana had threatened anybody, was armed, violent or dangerous. Dispatch never indicated hearing screaming or crying in the background. Dispatch never stated Dana requested assistance, had a health or medical issue, or indicated a concern for his welfare or safety. Neither dispatch nor the investigative officers from Georgie's indicate the caller was the one with the gun. At no time did Dana tell anyone he had a gun at 402 Kline Avenue, he only said a black male at Georgie's had a gun.

(Plaintiff's Motion at 655 (record citations omitted).)

Plaintiff's argument, although strictly true, is too simplistic in light of the record facts. "The 'reasonableness' of a particular [action] must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989) (citation omitted). "[J]udges should be cautious about second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation." *Ryburn v. Huff*, -- U.S. --, 132. S. Ct. 987, 991-92, 181 L. Ed. 2d 966 (2012) (per curiam).

The officers here were aware that someone, possibly someone in the Kline Avenue residence, had called 911 to report a man with a gun at Georgie's. When the officers investigated that information, the bartender at Georgie's reported that she had overheard a white male arguing with a black male, asserting that he (the white male) had a gun in his van. That white male had left Georgie's in his white work van. Subsequently, more 911 calls were made and the dispatchers were able to connect those calls to the first call and to the Kline Avenue residence. When the officers arrived at the residence, they observed a white van in the driveway; that van was registered to plaintiff, whose physical description on file with the BMV matched the vague description of the white male given by Georgie's bartender. One of the officers, who

14

knocked on the front door to inquire (announcing himself as a police officer), heard the dead bolt being locked. Another officer at the back of the house observed a white male exit and then quickly re-enter the house when he saw the officer. The officers did not know who actually was in possession of the alleged gun. They were informed by the 911 operator that the caller had called repeatedly, had been rude, had used obscene and vulgar language, and had actually hung up on the operator. The officers had no way of knowing whether the man they saw exit and re-enter the residence was its only occupant. They had no way of knowing whether *he* was actually the man with the gun. They had no way of knowing whether the 911 caller's rude behavior was the result of a medical emergency of some sort.

In short, given what the officers knew, it was not objectively unreasonable for them to enter the residence to check on the welfare of anyone inside. This conclusion is even more compelling in light of the fact that plaintiff's own repeated and ineffective calls to 911 were actually the *cause* of the confusion among the officers on the scene. In hindsight, it is well and good, as plaintiff asks, to conclude that plaintiff was no danger to himself or anyone else, that he had a right to refuse to answer the door (and, in fact, to lock it) when the officers knocked, and that it is no crime to walk in and out of one's own back door. But that is the very "wisdom of hindsight" approach that the Supreme Court rejected in *Graham*. 490 U.S. at 396. This Court equally rejects Gradisher's suggestion to second-guess the officers' decision to enter his residence.[13]

---

[13] Officers are often placed in a catch-22 situation such as the one that existed here. If they enter and it turns out they were wrong in the exercise of their discretion, they get sued. But if they fail to enter and someone is injured (or not rescued), they get sued for that. *See, Bukowski v. City of Akron*, 326 F.3d 702 (6th Cir 2003) ("[u]nder the legal theory adopted by the plaintiffs, the defendant officials would have violated the Constitution no matter how they acted[ ]").

Defendants did not violate the Fourth Amendment when they entered plaintiff's residence without a warrant and, therefore, they are entitled to summary judgment on the second claim for relief.

The Court now turns to plaintiff's claim of excessive force during his arrest. Under the Fourth Amendment, "the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 22-27, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene[.]" *Id.* "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment." *Id.* (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (6th Cir. 1973)). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97. Further, "the Fourth Amendment does not require officers to use the best technique available as long as their method is reasonable under the circumstances." *Dickerson v. McClellan*, 101 F.3d 1151, 1160 (6th Cir. 1996) (citation omitted).

In making a determination regarding reasonableness, a court "must look at the totality of the circumstances, including three factors: first, 'the severity of the crime at issue'; second, 'whether the suspect poses an immediate threat to the safety of the officers or others,' and third, 'whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Correa v. Simone*, 528 F. App'x 531, 534 (6th Cir. 2013) (quoting *Graham*, 490 U.S. at 396). Here, the severity of the crime is largely irrelevant. The crime, if any, was abuse of the 911 system, a

16

crime that, although serious, would not qualify as particularly severe for purposes of the need to use force. The remaining two factors are more relevant.

Here, officers entered a residence understanding there was a possibility that a person needed assistance. They knew that someone connected to the residence had repeatedly called 911 and had seemed clearly agitated during the calls. There was also mention of a gun, although the officers could not be entirely certain who possessed that gun. After legitimately entering the home, they discovered someone hiding under a sheet, in the corner of the basement, behind some shelves. Once the sheet was removed by an officer, that person had clenched fists and at least one hand that was out of sight; he repeatedly pulled away from the officers as they tried to pin his arms.

Given "the practical difficulties of attempting to assess [a] suspect's dangerousness[,]" *Tennessee v. Garner*, 471 U.S. 1, 20, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985), a reasonable officer in these circumstances could reasonably have believed that the person he encountered posed a danger to him and his companion officers, especially where, as here, the individual did not clearly surrender and submit himself to handcuffing--facts that could be interpreted as actively resisting arrest. *See Caie v. W. Bloomfield Twp.*, 485 F. App'x 92, 96 (6th Cir. 2012) (holding that tasing a suspect who refuses to move his hands from under his body so as to be handcuffed is not excessive force); *Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 509 (6th Cir. 2012) ("If a suspect actively resists arrest and refuses to be handcuffed, officers do not violate the Fourth Amendment by using a taser to subdue him."); *see also Watson v. City of Marysville*, 518 F. App'x 390, 393 (6th Cir. 2013) (noting that there is no clearly established right to be free from tasing where a person "disobeys police orders and may be in

possession of a weapon[ ]") (citing *McGee v. City of Cincinnati Police Dep't*, No. 1:06-CV-726, 2007 WL 1169374, at *5 (S.D. Ohio Apr. 18, 2007)).

The force used here was not excessive in light of the totality of the circumstances, defendants did not violate the Fourth Amendment, and, therefore, defendants are entitled to summary judgment on the first claim for relief.[14]

**B.      Fourth Claim for Relief: 42 U.S.C. § 1983 Malicious Prosecution (Fourth and Fourteenth Amendments)**

Plaintiff alleges that, "[a]cting under color of law and within the course and scope of [his] employment as [a] police officer[] with Defendant City of Akron, Hackathorn . . . instituted criminal prosecution, charges and/or proceedings against [him], maliciously in violation of his rights guaranteed under the Fourth and Fourteenth Amendments." (Compl. ¶ 70.) He further alleges that Hackathorn "had no probable cause" for instituting the criminal charges and that the proceedings "terminated in his favor on the resisting arrest charge." (*Id.* ¶¶ 72, 73.) He asserts that "[f]aced with the circumstances present on September 2, 2011, reasonably prudent law enforcement officers . . . would or should have known that instituting the criminal prosecution, charges and/or proceedings against Plaintiff violated his clearly established Fourth and Fourteenth Amendment rights." (*Id.* ¶ 75.)

To prevail on this claim, Gradisher must prove the following: "(1) a criminal prosecution was initiated against the plaintiff and the defendant made, influenced, or participated in the decision to prosecute; (2) there was no probable cause for the criminal prosecution; (3) as a consequence of the legal proceeding, the plaintiff suffered a deprivation of liberty apart from the initial seizure; and (4) the criminal proceeding was resolved in the plaintiff's favor."

---

[14] It is also noteworthy that plaintiff does not allege that the officers used any force on him after they managed to handcuff him. All the tasering occurred prior to the handcuffing.

18

*Robertson v. Lucas*, -- F.3d --, 2014 WL 2198419, at *6 (6th Cir. May 28, 2014) (citing *Sykes v. Anderson*, 625 F.3d 294, 308-09 (6th Cir. 2010)).

Here, Hackathorn signed criminal complaints against Gradisher in the Akron Municipal Court for improper use of the 911 system and for resisting arrest. Gradisher entered a no contest plea with respect to the former and the latter was dismissed. Even if this Court were to conclude that the facts do not support probable cause for the charge of resisting arrest (a conclusion it does not reach), there clearly was probable cause for the charge of improper use the 911 system.

Defendant Hackathorn is entitled to summary judgment on this claim.

## C.    Fifth Claim for Relief: 42 U.S.C. § 1983 Municipal Liability

For his final § 1983 claim, plaintiff alleges that "Akron police officers[] have a history of violating citizens' constitutional rights, using excessive force, making warrantless searches, entries, and arrests without probable cause, and arresting and charging citizens with criminal offenses that are not supported by probable cause[.]" (Compl. ¶ 78.) He alleges that the City of Akron[15] is liable for "fail[ure] to adequately and properly supervise" the officers (*id.* ¶ 79), that the City "ratified" the officers' conduct (*id.* ¶ 80), and that the constitutional violations alleged resulted from "customs and policies for training and supervision" that were implemented by the City of Akron (*id.* ¶ 81).

---

[15] Plaintiff also directs this fifth claim for relief at defendant Nice. There is no dispute that Nice had no direct involvement in the arrest of Gradisher, and he cannot be held personally liable for any actions of the other officers. *Hays v. Jefferson Cnty., Ky.*, 668 F.2d 869, 872 (6th Cir. 1982) (citing *Monell* and *Jones v. City of Memphis*, 586 F.2d 622 (6th Cir. 1978) for the proposition that § 1983 liability cannot be based solely on a theory of *respondeat superior*). The only apparent reason to include him in the fifth claim is to create municipal liability due to Nice's alleged role as a "policymaker" for the City.

In order to prevail on this *Monell* claim against the City,[16] plaintiff must first establish an underlying constitutional violation. In *City of Los Angeles v. Heller*, 475 U.S. 796, 106 S. Ct. 1571, 89 L. Ed. 2d 806 (1986), the Supreme Court concluded that "[i]f a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point." *Id.* at 799; *see also D'Ambrosio v. Marino*, 747 F.3d 378, 391 (6th Cir. 2014) (quoting *Heller*).

Here, plaintiff has failed to establish any constitutional violation. Therefore, the City is entitled to summary judgment on the fifth claim for relief.

**D.     Seventh Through Eleventh Claims for Relief (State Law Claims)**

Defendants argue that they are entitled to statutory immunity with respect to Gradisher's state law claims, all of which sound in tort.

Ohio Rev. Code § 2744.02(A)(1) provides that "a political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function."

Ohio Rev. Code § 2744.03(A)(6) provides that employees of a political subdivision are immune from liability for state law torts unless: "(a) [t]he employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities; (b) [t]he employee's acts or omissions were with malicious purpose, in bad faith,

---

[16] *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 694-95, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978) (a municipality can be held liable under § 1983 if the plaintiff demonstrates that the injury suffered was a direct result of the municipality's official policy or custom).

or in a wanton or reckless manner; (c) [c]ivil liability is expressly imposed upon the employee by a section of the Revised Code. . . ."

Under these two sections of Ohio statutory law, the City of Akron and the individual defendants are immune from liability because they were clearly performing a governmental function (i.e., police services), and because there is no showing that any statutory exception applies.

Accordingly, the defendants are entitled to summary judgment on the seventh, eighth, ninth, tenth, and eleventh causes of action.

## V. CONCLUSION

For the reasons discussed herein, defendants' motion for summary judgment (Doc. No. 48) is **GRANTED**; plaintiff's motion for partial summary judgment (Doc. No. 49) is **DENIED**.

**IT IS SO ORDERED**.

Dated: September 2, 2014

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**

21